## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for OGLETHORPE BANK, <br><br> Plaintiff, <br><br> v. <br><br> LAURA CROSS-MCKINLEY, GWENDOLYN R. O'CONNOR, ROBERT STRANGE, III (nominally to the extent of insurance coverage only), ERNEST M. CHAMPION, M. FRANK DELOACH, III, RONALD E. PERRY, JOHN BRADLEY STROUD, JOHN CHARLES WELCH, DIANE C. BAILEY, LEE A. CARMICAL, and ERIC C. SEGERBERG <br><br> Defendants. | CIVIL ACTION FILE NO.: <br><br> _____ <br><br> JURY DEMAND |

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

---

The Federal Deposit Insurance Corporation ("FDIC"), as Receiver ("FDIC-Receiver") for Oglethorpe Bank ("Oglethorpe" or "Bank"), hereby files its Complaint against the Defendants, showing the Court as follows:

## I.
## INTRODUCTION

1.    On January 14, 2011, with its capital depleted, Oglethorpe was closed by the Georgia Department of Banking and Finance ("GDBF") and the FDIC was

appointed receiver. Pursuant to 12 U.S.C. § 1821(d)(2), the FDIC-Receiver succeeded to all rights, titles, and privileges of Oglethorpe and its depositors, account holders, creditors, and stockholders.

2.     At the time it was closed, Oglethorpe held approximately $211.1 million in assets and was wholly owned by Oglethorpe Bank Holding Company, Inc. ("OBHC"), a single-bank holding company, which continues to operate in Georgia. The Bank's failure has caused a loss to the FDIC's Deposit Insurance Fund of approximately $98.2 million.

3.     In this action, the FDIC-Receiver seeks to recover approximately $9.88 million of damages caused by the acts and omissions of eleven directors of the Bank (three of which were also officers), for their negligence, gross negligence, and breaches of fiduciary duty in the operation and management of the Bank's lending function, including the lending of depositor funds. Defendants are former Oglethorpe officers Laura Cross-McKinley, Gwendolyn R. O'Connor, and Robert Strange, III (collectively, the "Officer Defendants"), and non-officer directors Ernest "Chip" M. Champion, M. Frank DeLoach, III, Ronald E. Perry, John Bradley Stroud, John Charles Welch, Diane C. Bailey, Lee A. Carmical, and Eric C. Segerberg (collectively, the "Director Defendants," and together with the Officer Defendants, the "Defendants"). The FDIC-Receiver seeks compensatory

damages and other relief as a result of Defendants' tortious conduct (the "Damages").

4.      As officers and directors, Defendants were charged with, in addition to other duties, the duty to: (i) safeguard Oglethorpe's financial condition; (ii) prudently and reasonably operate and manage the lending function; (iii) prudently manage the Bank; (iv) make informed, good faith decisions; and (v) ensure safe and sound banking practices.  Defendants were also obligated to comply and ensure compliance with banking laws, regulations and supervisory guidance, and the Bank's own written loan policies and procedures.

5.      More specifically, and among other things, as members of the Director's Loan Committee (the "DLC"), Executive Committee, and/or the Board of Directors (the "Board"), Defendants had direct responsibility for the approval of loans, including loans made with the use of depositor funds.  In gross derogation of their duty to engage in safe and sound banking practices, Defendants: (i) failed to properly oversee the lending function of the Bank; (ii) improperly approved millions of dollars in facially deficient loans; (iii) allowed and encouraged an excessive and irresponsible concentration of residential loans, commercial loans, acquisition, development, and construction ("ADC") loans, and commercial real estate ("CRE") loans; (iv) approved loans that violated the loan policies of the Bank in effect at the time the loans were made (referred to cumulatively as the

"Loan Policy") and applicable federal and state regulations; and (v) permitted poor loan underwriting in contravention of the Bank's policies and reasonable industry standards.

6.     Defendants were negligent, grossly negligent, and breached their fiduciary duties by, among other things, recommending, presenting for approval, and/or participating in the approval of transactions that violated Oglethorpe's internal policies and prudent, safe, and sound banking practices.  Among other things, Defendants: (i) failed to establish proper and complete underwriting policies; (ii) originated, recommended, and/or approved transactions involving depositor funds in violation of the Loan Policy, applicable rules and regulations, supervisory direction and guidance, and reasonable industry standards; (iii) extended credit to borrowers that were not creditworthy; (iv) extended credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow, the ability to repay, and other critical financial information; (v) approved and originated speculative commercial, ADC, and CRE loans despite known adverse economic conditions in the local real estate market; (vi) failed to inform themselves about the risks posed by the loans prior to approval; (vii) permitted unsafe and unsound concentrations of credit; (viii) failed to properly manage and preserve depositor funds; and (ix) failed to supervise, manage, conduct, and direct the business and affairs of the

Bank to ensure compliance with prudent principles of banking and the safeguarding of depositor funds.

7.      As described in more detail below, the Defendants' negligence, gross negligence, and breach of fiduciary duties in their numerous, repeated, and obvious violations of the Loan Policy, underwriting requirements, banking regulations, and prudent, safe, and sound banking practices are exemplified by twenty-four (24) commercial, CRE, ADC, residential, and unsecured loan transactions, which proximately caused Damages of an amount to be proven at trial of approximately $9.88 million.[1]

8.      As the Bank's receiver, the FDIC-Receiver seeks recovery on behalf of those who have a legitimate interest in the Bank's receivership estate, including creditors, depositors, and stockholders, all of whose rights the FDIC-Receiver holds pursuant to 12 U.S.C. § 1821(d).

## II.
## THE PARTIES

9.      The FDIC is a corporation and instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C.  12 U.S.C. § 1821(d).  Pursuant to 12 U.S.C. § 1821(c), the FDIC was appointed as Receiver for Oglethorpe on January 14, 2011, by the GDBF.  Pursuant to 12 U.S.C. §

---

[1] This is not a collection action against the borrowers or guarantors on the Loss Transactions, but an action sounding in tort against Bank officers and directors for improperly recommending and approving the Loss Transactions.

1821(d)(2)(A)(i), the FDIC-Receiver succeeded to all rights, titles, powers, and privileges of, *inter alia*, the Bank, its depositors, account holders, creditors, and stockholders, including but not limited to, all rights to pursue the claims alleged herein against the Bank's former directors and officers directly, and derivatively on behalf of the Bank's stockholders without pre-complaint demand.

10.     Laura Cross-McKinley ("Cross-McKinley") was the Bank's President and Chief Executive Officer ("CEO") from 2003 until the Bank failed. Cross-McKinley was also a director from 2003 until she resigned on May 6, 2010. During all times relevant to the claims set forth herein, Cross-McKinley served on the Bank's Executive Committee and DLC. As CEO, Cross-McKinley was responsible for the overall management of the Bank, including, but not limited to, ensuring that the Bank adopted, maintained, and adhered to adequate loan policies, procedures, and internal controls, and that the Bank followed safe and sound lending practices. Cross-McKinley had the duty to advise the Bank's Board of Directors and senior management against taking actions that violated the Bank's internal policies or safe and sound banking practices. In abdication of her duties, Cross-McKinley recommended and/or approved 22 of the 24 loss transactions described below.

11.     Robert Strange, III ("Strange") was the Bank's Executive Vice President and Chief Lending Officer ("CLO") from 2003 to December 2010.

Strange was also a founding director of the Bank from 2003 until he resigned on May 6, 2010.[2] During all times relevant to the claims set forth herein, Strange also served on the Bank's Executive Committee and DLC. As CLO, Strange was responsible for the Bank's lending operations, including, but not limited to, ensuring that Oglethorpe adopted, maintained, and adhered to adequate loan policies and followed safe and sound lending practices. Strange's duties as CLO included the duty to advise the Board and senior management against taking actions that violated the Bank's internal policies or safe and sound lending practices. In abdication of his duties, Strange recommended and/or approved 22 of the 24 loss transactions described below.

12.     Gwendolyn R. O'Connor ("O'Connor") was the Bank's Senior Vice President and Chief Operations Officer from 2003 until the Bank's failure. O'Connor was also a director from 2004 until the Bank failed. During all times relevant to the claims set forth herein, O'Connor also served on the Executive Committee and DLC. In abdication of her duties, O'Connor recommended and/or approved 22 of the 24 loss transactions described below.

---

[2] On January 3, 2011, Strange filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Southern District of Georgia. A Notice of Discharge was entered by the Bankruptcy Court on May 12, 2011. On August 8, 2011, the Bankruptcy Court entered a Consent Order permitting the FDIC-Receiver to name Strange in a lawsuit for the sole purpose of recovering under the applicable insurance policy. As permitted by the Consent Order and 11 U.S.C. § 524(e), the FDIC-Receiver brings this action against Strange as a nominal defendant only, in order to establish liability as a prerequisite to recovery under the applicable insurance policies. *See In re Hayden*, 477 B.R. 260 (Bankr. N.D. Ga. 2012). The FDIC-Receiver does not seek to hold Strange personally liable for the payment of any judgment which may be rendered against him in this action, in accordance with 11 U.S.C. § 524(a).

13.     Ernest "Chip" M. Champion ("Champion") served as a director of the Bank from 2003 to December 31, 2010.  During all times relevant to the claims set forth herein, Champion also served on the DLC.  In abdication of his duties, Champion approved 22 of the 24 loss transactions described below.

14.     M. Frank DeLoach, III ("DeLoach") was a founding member of the Bank, and a director from 2003 to June 7, 2010.  During all times relevant to the claims set forth herein, DeLoach also served on the Executive Committee and DLC.  In abdication of his duties, DeLoach recommended and/or approved 22 of the 24 loss transactions described below.

15.     Ronald E. Perry ("Perry") was a Bank director from 2003 to September 15, 2010.  During all times relevant to the claims set forth herein, Perry also served on the DLC.  In abdication of his duties, Perry approved 22 of the 24 loss transactions described below.

16.     John Bradley Stroud ("Stroud") was a Bank director from 2003 until the Bank's failure.  During all times relevant to the claims set forth herein, Stroud also served on the DLC.  In abdication of his duties, O'Connor approved 21 of the 24 loss transactions described below.

17.     John Charles Welch ("Welch") was a founding member of the Bank, and Chairman of the Board of Directors from 2003 until the Bank failed.  During all times relevant to the claims set forth herein, Welch also served on the Executive

Committee and the DLC.  In abdication of her duties, Welch recommended and/or approved 22 of the 24 loss transactions described below.

18.     Diane C. Bailey ("Bailey") was a director of the Bank from 2003 until the Bank failed.  In abdication of her duties, Bailey approved 13 of the 24 loss transactions described below.

19.     Lee A. Carmical ("Carmical") was a director of the Bank from 2003 until the Bank's failure.  In abdication of his duties, Carmical approved 14 of the 24 loss transactions described below.

20.     Eric C. Segerberg ("Segerberg") was a director of the Bank from 2003 until the Bank failed.  In abdication of his duties, Segerberg approved 11 of the 24 loss transactions described below.

21.     As members of the Bank's DLC, Defendants Cross-McKinley, O'Connor, Strange, Champion, DeLoach, Perry, Stroud, and Welch were responsible for deciding whether and on what terms the Bank would extend funds to borrowers.  Each DLC member had a duty to make prudent decisions based on adequate information about the use of loan proceeds, the creditworthiness of borrowers and guarantors, the value of underlying collateral, the source(s) of repayment, collectability, the composition and condition of the Bank's loan portfolio, including the risks arising from any concentrations of credit, and other circumstances relevant to making  informed and prudent decisions.

22.     As Bank Directors, the Director Defendants were responsible for: (i) selecting, monitoring, and evaluating the Bank's senior management; (ii) establishing business strategies and policies that comported with safe and sound banking practices; (iii) monitoring and assessing the Bank's business operations; (iv) establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness; (v) reviewing and approving the actions of the DLC, including, but not limited to the DLC's action in approving the loan transactions referenced herein; (vi) overseeing the activities and actions of the Bank's loan officers; (vii) heeding warnings and following directives from the Bank's regulators; and (viii) making business decisions on the basis of fully informed and meaningful deliberation.   These duties included the duty to supervise senior management so as to prevent the Bank from taking actions that violated the Bank's internal policies or safe and sound banking practices.

## III.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction of this matter because actions in which the FDIC is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et seq.*; 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. §§ 1331 and 1345.  The FDIC has the power to bring suit in any court of law.  12 U.S.C. § 1819.

24.     This Court has personal jurisdiction over Defendants, who at all relevant times were residents of and/or conducted business in the State of Georgia.

25.     Venue is proper in this district under 28 U.S.C. § 1391(b) as one or more of the Defendants reside in this district and all or substantially all of the acts, events or omissions giving rise to the claims charged herein occurred in this district.

## IV.
## FACTUAL ALLEGATIONS

26.     Oglethorpe, a state nonmember bank, was founded by Defendants Strange, DeLoach, and Welch on August 26, 2003.  Since its inception, the Bank was owned by OBHC, a single-bank holding company that continues to operate in good standing in Georgia.  At all times relevant to this lawsuit, Oglethorpe maintained branches in Brunswick and Saint Simons Island, Georgia.

27.     In connection with and as evidence of their duties as Directors, Defendants executed an "Oath of the Bank Director" (the "Oath") on or about June 22, 2006.[3]  In their Oath, each Defendant acknowledged and swore that he or she:

- Had a "legal responsibility and a fiduciary duty to shareholders to administer the [Bank's] affairs faithfully and to oversee its management";

- Will "exercise reasonable care and place the interests of the [Bank] before my own interests";

---

3 O.C.G.A. § 7-1-484 requires bank directors in Georgia to take an oath and the FDIC-Receiver has to date located Oaths signed by all Defendants except Perry, who, on information and belief, executed and/or swore to the same Oath as the other Defendants.

- Will "fulfill my duties of loyalty and care to the [Bank]"; and

- Will "diligently and honestly administer the affairs of the [B]ank[.]"

28.     Defendants caused Oglethorpe's assets to grow very quickly, and after one year of operation, examiners noted that loan growth was occurring faster than anticipated.  Defendants' growth strategy was based upon residential and CRE loan transactions, and they catered to local real estate agents and developers involved in speculative ADC projects for vacation properties along Georgia's coastline.  As early as 2005, bank examiners cautioned that the Bank had a 28% concentration of credit to one such developer.    Nonetheless, Defendants continued with their unbridled growth plan without implementing reasonable policies and procedures to mitigate the high risk presented by these speculative ventures.    Moreover, Defendants recommended and approved loans in which it was obvious that the borrowers could not repay from their own funds, repeatedly violated the Bank's Loan Policy, and granted speculative loans secured only by second or third mortgages.  Finally, as noted below in the summaries of the Loss Transactions, Defendants readily disbursed depositor funds to their friends, acquaintances, and/or business partners, regardless of their creditworthiness.

### A.    Standards for Risk Management Procedures in Banking.

29.     It is a fundamental tenet of banking that loan underwriting practices are the primary determinant of a bank's credit risk and one of the most critical

aspects of loan portfolio risk management.   Functionally, loan underwriting standards are intended to provide a safe and sound level of creditworthiness for individual loans and provide uniform criteria for evaluating loans with similar characteristics.   Loan underwriting standards protect depositors' funds and a bank's capital, which can erode from unsafe and unsound lending practices.   All banks are required to promulgate, implement, and adhere to written loan policies that incorporate basic principles of safety and soundness.

30.     Underwriting practices (which are described in Part 364 and 365 of the FDIC Rules and Regulations, 12 C.F.R. § 364.100 et seq. and 12 C.F.R. § 365.1 et seq.) generally consist of policies, processes, and criteria used to qualify borrowers, and to establish repayment terms, sources of repayment, and collateral requirements.   Underwriting practices also encompass the management and administration of the loan portfolio, including its growth and concentration in specific market segments.

31.     The loan approval process is a critical tool in preventing bad loans.   A prudent loan approval process establishes minimum requirements for the information and analysis upon which a credit decision is based.   This permits the decision makers to make an informed judgment on whether the proposed transaction offers acceptable credit, collateral, and repayment sources.

32.    Without adequate information and analysis regarding a proposed transaction, decision makers cannot exercise an informed judgment as to whether that transaction is acceptable or in a bank's best interest.

33.    Risk diversification is also fundamental to the proper management of any loan portfolio.   12 C.F.R. § 30, "Standards for Safety and Soundness" (Appendix B), requires banks to accord adequate consideration to concentrations of credit risk in their underwriting practices.

34.    CRE and ADC loans are known to be more speculative than other types of loans because, among other reasons, of the lack of present cash flow source, uncertainties of development and sale, and the need for adequate secondary sources of repayment.  Prudent lending in this segment of banking requires sound underwriting, timely evaluation and responses to economic trends impacting the industry and strict adherence to prudent lending policies and standards.

35.    Defendants acted with utter disregard to the standards for prudent risk management practices in banking and violated their Oath by, among other things: (i) originating, recommending, and/or approving loans in violation of the Bank's Loan Policy; (ii) extending credit to borrowers that were not creditworthy; (iii) extending credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow and other critical financial information; (iv) approving and originating speculative

commercial real estate loans despite known adverse economic conditions in the local real estate market; (v) failing to inform themselves about the risks posed by the loans prior to approval; (vi) permitting unsafe and unsound concentrations of credit; (vii) failing to properly manage and preserve the resources of the Bank; and (viii) failing to supervise, manage, conduct, and direct the business and affairs of the Bank to ensure compliance with prudent principles of banking.

### B.   Ignoring Regulatory Guidance and Warnings.

36.   Defendants' focus on CRE lending led to a concentration in CRE loans that exceeded both that of its peer group and the regulatory guidance specified in Financial Institution Letter 104-2006, *Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*.   71 Fed. Reg. 74580-01, 87 (2006) (the "Guidance").   Among other things, the Guidance stated that regulators would consider banks with CRE concentrations exceeding 300% of risk-based capital, or ADC concentrations exceeding 100% of risk-based capital, potentially exposed to significant CRE concentration risk and in need of heightened risk-management practices.   The key elements of these risk-management practices included board and management oversight, portfolio management, management information systems, credit underwriting standards, portfolio stress testing and sensitivity analysis, and credit risk review functions.

37.     From 2007 to 2009, the Bank's concentration of CRE loans exceeded the Guidance's threshold of 300% of the Bank's Tier 1 capital.  In contravention of the Guidance, Defendants increased Oglethorpe's CRE concentration without employing the risk-management practices called for by the Guidance.

38.     Defendants knew or should have known that Oglethorpe's concentration in CRE loans substantially increased the  Bank's risks for numerous reasons, including the well-known principles that:  (i) concentration in any sector of the economy increases risk resulting from that sector's downturn; (ii) the real estate and housing markets, in particular, are cyclical by nature; (iii) the primary source of repayment for these types of loans is the cash flow from the sale of the real estate collateral; and (iv) historically, bank failure rates closely correlate with high CRE and/or ADC concentrations.  In short, concentrations of CRE and/or ADC loans in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices and concentration ratios.

39.     In addition to ignoring basic principles of CRE lending and the admonitions of the Guidance, Defendants ignored repeated specific warnings from examiners about systemic underwriting deficiencies at the Bank beginning in September 2004.  These warnings included, among other things, that: (i) the Bank's loan portfolio consisted of 65% interest-only loans; (ii) there was no proper

credit analyses of borrowers' cash flow or ability to repay; (iii) 29.3% of loans that examiners reviewed in 2005 lacked critical credit documents; (iv) loan-to-value ("LTV") ratios were improperly calculated; (v) concentrations of speculative ADC loans to one developer and related individuals was increasing; (vi) the residential real estate market was slowing; (vii) the inventory of speculative houses on the market was growing; and (viii) the Bank's borrowers were highly leveraged.

40.     Examiners also warned the Defendants that the Bank's adversely classified assets had skyrocketed from $93,000 in 2006, to $4.18 million in 2007, and to $10.8 million in 2008.  Further, between 2007 and 2008, the Bank's loan portfolio grew by $40.66 million, with adversely classified assets representing 4.2% of the Bank's total loan portfolio.  Despite this worsening trend, Defendants continued to make loans to non-creditworthy borrowers.

41.     Defendants also failed to implement the recommendations of the Bank's loan consultant, Young & Associates, Inc. ("Y&A").  In February 2007, Y&A advised the Board in a Loan Review Management Report that loan presentations must include global cash flow analyses for borrowers and guarantors in order to properly assess whether loans would be repaid. Y&A warned the Defendants that "it is imperative that a complete and accurate financial analysis be completed and utilized during the approval process." Y&A repeated this warning in its June 2007 Loan Management Review Report.   In July 2010, in response to a

questionnaire presented by one of the Bank's consultants, Defendant Bailey acknowledged the Defendants' failure to implement recommendations by Y&A, admitting that "[the Defendants] loaned money where not enough collateral was put up or *not enough research was done to make sure the [borrower] had enough cash flow to pay the loan*" (emphasis added).

42.    By ignoring the warnings from examiners and Y&A, Defendants violated their Oath, abdicated their responsibility to protect the Bank's assets, and ignored the facial deficiencies in the Loss Transactions described below before they were approved.  When the economy foreseeably declined in 2007 and 2008, the grossly imprudent loans made by Defendants critically eroded the Bank's capital, weakened liquidity, and resulted in substantial negative earnings.

43.    By the fall of 2008, the Bank was in serious financial trouble, and the Defendants knew it. At that time, Defendants on two separate occasions had secured capital injections from the Bank's holding company, and also began taking steps to apply for taxpayer funds through the U.S. Treasury's Troubled Asset Relief Program ("TARP").

44.    Finally, in 2009, despite the Bank's precarious position and the widespread deterioration of financial and real estate markets, the Defendants approved the largest of the loss transactions, a $2.5 million loan to another bank's holding company.

**C.    Waste of Bank Assets.**

45.    Defendants' goal was to increase the Bank's assets as quickly as possible through commercial lending transactions, including loans to local real estate agents and developers pursuing speculative ADC projects along Georgia's coastline.  This imprudently managed growth allowed Defendants to fund what one Defendant admitted were "unnecessary perks," including, but not limited to:

> a.    A $30,000, all-expenses-paid, long weekend retreat for the director Defendants and their spouses at the Ritz Carlton, Amelia Island, Georgia;
>
> b.    Paying themselves $278,000 in directors' fees in 2009;
>
> c.    Purchasing a membership to Sea Island Club for Defendant Cross-McKinley and paying all of Defendant Strange's Sea Island Club membership dues; and
>
> d.    Buying a membership to the Brunswick Country Club for all of the Bank's directors.

46.    These unnecessary perks constituted a waste of corporate assets.

**D.    Oglethorpe's Loan Policy and Loan Approval Authorities.**

47.    Although it was amended from year to year, the material provisions of the Loan Policy relevant to the twenty-four (24) loss transactions remained the same, unless otherwise noted.  The Loan Policy provided, among other things:

> a.    Commercial loan underwriting required a thorough evaluation of the borrower, including proper documentation of character, collateral, financial condition, loan purpose, and a defined repayment program that considered primary and secondary

repayment sources, types of collateral, and economic environment;

b. Analysis of any borrower's or guarantor's capacity to pay the loan was required, including, but not limited to, analysis of assets, net worth, liquidity, terms of any trusts, cash flow, and contingent liabilities;

c. Loans must be made on the lower of the LTV or loan-to-cost ("LTC") ratios specified in the Loan Policy: ratio limits were 65% for raw land loans, 75% for land development loans, 85% for improved investment commercial property, and, in the 2008 iteration of the Loan Policy, 80% for CRE loans; and

d. Undesirable loans were to be avoided. Such loans included, but were not limited to, credits secured by stock in closely held entities, loans used for speculative real estate investments unless supported by substantial borrower creditworthiness and collateral, and loans to finance a down payment to purchase real estate.

48.    Loan approval authority was based on the total credit amount outstanding to the borrower at the time of approval, and was vested in the DLC and the Board of Directors.  Under the 2007 iteration of the Loan Policy, the DLC could approve loans between $750,000 and $2 million without Board approval. The 2008 and 2009 versions of the Loan Policy decreased the DLC's approval authority to loans between $500,000 and $1 million.  Any loans exceeding $1 million would have to be approved by the Board.

49.    As detailed herein, Oglethorpe suffered substantial Damages as a result of Defendants' significant departures from safe and sound banking practices. Each of the Defendants repeatedly disregarded the Bank's Loan Policy and

approved transactions with borrowers who were not creditworthy and/or projects that provided insufficient collateral and guaranties for repayment.

### E.   The Loss Transactions.

50.    The loss transactions arise from twenty-four (24) loans ("Loss Transactions") that Defendants approved from March 26, 2007 through January 21, 2010.  Champion, Cross-McKinley, DeLoach, O'Connor, Perry, Strange, and Welch each approved twenty-two (22) of the loans; Stroud approved twenty-one (21) of the loans; Carmical approved fourteen (14) of the loans; Bailey approved thirteen (13) of the loans; and Segerberg approved eleven (11) of the loans.

51.    All but one of the Loss Transactions was recommended to the Board and/or DLC by the Bank's Executive Committee, which was comprised of Defendants Cross-McKinley, DeLoach, O'Connor, Strange, and Welch (the "Executive Committee").[4]  The Executive Committee met *sua sponte* to discuss the Bank's operations, and their meetings neither included nor were reported to the Board.   According to several Defendants, the Executive Committee merely recommended proposed transactions to the Board with "fast and surface information" as proposals that "couldn't possibly fail."   The Board would "sometimes" have enough information to make an informed decision, but for the

---

4 The only exception is the TH Transaction, which Defendant Cross-McKinley unilaterally approved.

most part, votes were cast solely in reliance on whatever information the Executive Committee provided, with little or no discussion.

52.    With regard to each of the Loss Transactions, the information provided to the DLC or Board either showed on its face that the loan violated the Bank's Loan Policy or prudent lending practices or, alternatively, was manifestly insufficient to support any informed or reasonable decision to approve the proposed loan.  The Defendants repeatedly recommended and approved loans that, among other things, were made to non-creditworthy borrowers and violated the Bank's LTV limits.

53.    In connection with and as support for the Loss Transactions, a two-page Loan Committee Sheet ("LCS") was prepared and provided to the Defendants.  Each LCS was a summary of the transaction that purported to outline the loans' terms and other critical information, including, but not limited to, the purpose of the loan, personal and financial information regarding the borrower and any guarantors, payment terms, descriptions of collateral, recommending and approving officers, and alleged strengths and weaknesses of the transaction.  With respect to each of the Loss Transactions, the LCS showed on its face that the proposed loan would violate the Bank's Loan Policy, was not in the Bank's best interest, or lacked the basic information necessary to make a reasonably informed credit decision.

- 22 -

## ACOC Transaction[5]

54.     On or about May 21, 2007, the Bank approved a $750,000 letter of credit to ACOC (the "ACOC Transaction").  The terms of the transaction called for 24 monthly interest-only payments with principal due at maturity.  The purpose of the line of credit was twofold: $231,000 was to go toward refinancing an existing loan at another bank, and $519,000 was to go to ACOC for construction and remodeling expenses for a children's day care center in Glynn County, Georgia.  The line of credit was secured by a first lien on real estate in Brunswick, Georgia, and was guaranteed by six guarantors, one of which was Defendant Cross-McKinley.

55.     Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, and Perry recommended and/or approved the ACOC Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

> a.     The loan file was devoid of any financial statements from ACOC or any other information indicating that ACOC would be able to repay the debt.  The only repayment information in the file was in the form of two memos: one which provided that

---

[5] Borrowers and guarantors are identified in this Complaint by their initials only in order to preserve their right to financial privacy afforded by applicable Georgia and federal banking laws.  The Defendants, however, will be provided with the complete names of borrowers and guarantors.

the primary source of repayment would be the income from fundraisers and funds produced by the day care center, and another from Defendant Cross-McKinley noting that the day care center had sufficient funding to continue payment on the loan.

b.  The file lacked any disbursement control.  The line of credit was intended to refinance a preexisting note with another bank, with the balance going toward construction of the day care facility.  However, minutes from a board meeting on April 17, 2007 reflect that the determination of how the balance would be used "will be made by those board members who guaranteed the note."

c.  The LTC for this transaction was 100%, in violation of the Loan Policy.

d.  The LCS contains financial information for four of the six guarantors, who collectively had approximately $1.7 million in debt.

e.  Each of the guaranties was capped at $100,000.  Therefore, the best the Bank could hope for was the recovery of $600,000, which was less than the total amount of the debt.

       f.     The guaranties also lacked joint and several liability provisions, thus weakening their value and collectability.

56.    The ACOC Transaction defaulted, and the Bank suffered a loss of $528,000.

57.    Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, and Perry acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the ACOC Transaction, causing the Bank damages.

## EC Transactions

58.    In a nine month span, the Bank approved two separate transactions with EC. EC was Defendant DeLoach's business partner, as well as Defendant Bailey's brother.

59.    The first transaction took place on or about May 24, 2007, when the Bank extended a $250,000 line of credit to EC for the purpose of "investments" and paying off existing unsecured debt (the "First EC Transaction"). The First EC Transaction was secured by a second mortgage on real property in Saint Simons Island, and the terms called for twelve months of interest-only payments with principal due at maturity.

60.    Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud recommended and/or approved the First EC

Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

a.   The loan file was devoid of any cash flow analysis of the borrower, notwithstanding repeated warnings from regulators and the Bank's loan consultant to include such, and EC's net worth was based almost exclusively on real estate values in a declining market.

b.   The LCS showed, EC had $1,164,647.71 in direct debt at the time the loan was approved.

c.   Defendants relied on stale financial data, as the LCS indicates EC's annual income was based on 2005 financial information.

d.   Given EC's high debt level, lacking cash flow analysis and stale financial information, the primary repayment source was the value of the collateral.  Yet the Bank held only a second lien position.

e.   The LCS stated that a "key risk" of the transaction was its speculative nature. Such loans are deemed "undesirable" by the Loan Policy when unaccompanied by the financial strength of the borrower or guarantor.

- 26 -

61.     The First EC Transaction defaulted, and the Bank suffered a loss of $247,000.

62.     Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the First EC Transaction, causing the Bank damages.

63.     On or about February 27, 2008, Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud approved another loan to EC, in the amount of $692,750.00 (the "Second EC Transaction").  The purpose of the Second EC Transaction was to purchase a condominium unit for investment purposes.  The Second EC Transaction was secured by a first lien on the property, and the terms called for monthly interest-only payments with principal due at maturity.

64.     Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud recommended and/or approved the Second EC Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

> a.     Like the First EC Transaction, there was no cash flow analysis shown on the LCS or in the loan file. Instead, EC's net worth was based almost exclusively on real estate values in a

declining market.

    b.    The collateral was appraised at $815,000, which meant the LTV was at 85%, the maximum allowed by the Loan Policy. However, when properly combined with a prior note with the Bank that funded the down payment on the collateral, the LTV increased to 100%, in clear violation of the Loan Policy.

65.    The Second EC Transaction defaulted, and the Bank suffered a loss of $36,000.

66.    Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the Second EC Transaction, causing the Bank damages.

## JT Transactions

67.    From March 2007 to January 2010, the Bank issued funds to JT on four separate occasions.  The first transaction occurred on or about March 26, 2007, when Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud approved the disbursement of $495,000 (the "First JT Transaction") to JT.  The LCS stated that the purpose of this transaction was for an "additional advance on commercial property." The First JT Transaction was secured by a second lien on real property in Saint Simons Island.

68.     Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud recommended and/or approved the First JT Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

    a.    The LCS stated that the First JT Transaction was in excess of the lending limits expressly set forth in the Loan Policy.

    b.    The Bank's file lacked any cash flow analysis for JT. The LCS stated that JT had approximately $2,455,000 in direct debt at the time of the First JT Transaction. Yet the loan file contains no analysis of JT's current income compared to his monthly debt service.

    c.    The viability of repayment was even further weakened by the fact that the Bank had an inferior lien position with regard to the collateral.

69.     The First JT Transaction defaulted, and the Bank suffered a loss of $296,000.

70.     Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the First JT Transaction, causing the Bank damages.

71.     On or about May 9, 2007, Defendants engaged in a similar transaction, whereby they issued JT $466,000 (the "Second JT Transaction"). The Second JT Transaction was an additional disbursement on a prior note that was issued to pay down two loans at another bank. The Second JT Transaction was secured by a second lien on .737 acres of real estate in Saint Simons Island.

72.     Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, and Stroud recommended and/or approved the Second JT Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

> a.     Like the First JT Transaction, the Bank had no cash flow or repayment analysis to support the loan. Additionally, JT's direct indebtedness had risen to $3,436,000, making it even more unlikely that the loan could be repaid.

> b.     The primary repayment source for the loan was the collateral, which consisted of a second lien position on an empty lot in a struggling real estate market.

> c.     The LCS, without saying more, provided that the "size of [the] loan" violated the Loan Policy.

73.     The Second JT Transaction defaulted, and the Bank suffered a loss of $466,000.

74.    Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, and Stroud acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the Second JT Transaction, causing the Bank damages.

75.    Finally, in January of 2010, Defendants Cross-McKinley, Strange, O'Connor, Welch, Carmical, Champion, DeLoach, Perry, and Stroud approved two similar transactions with JT.  Each of the transactions was approved in order to purchase a first lien from BB&T on two separate pieces of collateral associated with two prior transactions.  One was in the amount of $324,976 (the "Third JT Transaction"), and the other was in the amount of $562,331.03 (the "Fourth JT Transaction").

76.    Defendants Cross-McKinley, Strange, O'Connor, Welch, Carmical, Champion, DeLoach, Perry, and Stroud recommended and/or approved the Third and Fourth JT Transactions despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

    a.    Defendants were aware of but ignored the fact that each of JT's prior ventures had been loss generators. Rather than limit the Bank's exposure to a questionable borrower, the Defendants threw caution to the wind and decided to loan JT even more

- 31 -

money.

b.      Contrary to the admonitions of Regulators and the Bank's loan consultant, these loans were presented and approved without a cash flow analysis of the borrower's ability to service the debt. At the time of the Third JT Transaction, JT's direct indebtedness had risen even more, to $3,542,479.41.

c.      Defendants knew or had reason to know that the borrower was overleveraged.  A May 9, 2008 line sheet report contained in the borrower's loan files stated that JT's "global cash flow does not support his debt service."

d.      The LCS stated that these two transactions exceed the lending limits set forth in the Loan Policy.

e.      At the time these transactions were approved, the LTV on both pieces of collateral had risen to 98% (for the Third JT Transaction), and 119% (for the Fourth JT Transaction), a clear violation of the Loan Policy.

77.     The Third and Fourth JT Transactions defaulted, and the Bank suffered a combined loss of $344,000.

78.     Defendants Cross-McKinley, Strange, O'Connor, Welch, Carmical, Champion, DeLoach, Perry, and Stroud acted negligently, grossly negligently, and

in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the Third and Fourth JT Transactions, causing the Bank damages.

### TAT Transaction

79.    In addition to the JT Transactions, Defendants also lent money to TAT, a company that was owned by JT.  On or about March 20, 2008, Defendants extended a $600,000 business line of credit to TAT (the "TAT Transaction").  The TAT Transaction was secured by a second lien on three condo units in Saint Simons Island, a third lien on an additional unit in Saint Simons Island, and JT's guaranty.  The terms of the TAT transaction called for interest-only payments for 35 months with principal due at maturity.

80.    Defendants Cross-McKinley, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud recommended and/or approved the TAT Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

      a.    Contrary to the admonitions of regulators and the Bank's Loan consultant, neither the loan file nor the LCS contained any cash flow analysis of the borrower or the guarantor.  The LCS revealed that TAT, which was wholly owned by JT, had approximately $2.8 million in direct debt at the time of origination.  Further, TAT's net worth was based almost

exclusively on the value of real estate in what the Defendants knew was a rapidly declining market.

b.      Given TAT's lack of liquidity, the primary source of repayment was the Bank's second lien position on the collateral.

c.      The LCS stated that the amount of the transaction exceeded the lending limits set forth in the Loan Policy.

81.     The TAT Transaction defaulted, and the Bank suffered a loss of $141,000.

82.     Defendants Cross-McKinley, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the TAT Transaction, causing the Bank damages.

### JD Transaction

83.     On or about June 27, 2007, Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud approved a loan in the amount of $675,000 to JD for the purpose of establishing a business line of credit (the "First JD Transaction"). The First JD Transaction was secured by a second lien on real property in Saint Simons Island. On or about September 4, 2008, the Bank increased the amount of the JD

Transaction by $250,000, bringing the total up to $928,000 (the "Second JD Transaction").

84.     All of the Defendants recommended and/or approved the First JD Transaction, and all of the Defendants except for Champion recommended and/or approved the Second JD Transaction, despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

   a.   With regard to the First JD Transaction, the loan file lacked any cash flow or repayment analysis for the borrower, whose net worth was based almost entirely on fluctuating real estate values in a declining market.

   b.   In connection with the Second JD Transaction, the Bank prepared a "Financial Underwriting Analysis," which reported an inordinately high debt-to-income ratio of 291.7%. The LCS recognized this as a concern, noting that "debt to reported income" was a "key risk" of the loan. When coupled with the increase in JD's indebtedness from the date of the First JD Transaction to the Second JD Transaction ($1.26 million to $1.9 million), it was apparent that JD would not be able to repay the debt.

c.   A June 26, 2007 memo prepared by the presenting loan officer stated that the primary source of repayment for the First JD Transaction was the sale of the collateral.   However, by the time the Second JD Transaction was approved, the value of the collateral had already decreased by $900,000.   The loan file also contained a memo dated September 4, 2008 (the date the Second JD Transaction was approved), stating that the Saint Simons Island real estate market was very slow.   Despite these clear red flag warnings, Defendants approved the Second JD Transaction without insisting on any additional collateral.

85.   The First JD Transaction and Second JD Transaction defaulted, and the Bank suffered a combined loss of $928,000.

86.   Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the First Transaction (and, with the exception of Champion, the Second JD Transaction), causing the Bank damages.

### D4E Transaction

87.   On or about July 19, 2007, Defendants Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud approved a

$1.435 million loan to D4E (the "D4E Transaction"), a company that was 50% owned by JD. The purpose of the transaction was to refinance a loan secured by commercial real estate. The terms of the D4E Transaction called for monthly interest-only payments with principal due at maturity. The D4E Transaction was secured by a first lien on the real estate, a third lien on a separate piece of real estate in Saint Simons Island, and the guaranties of JD and another owner of D4E.

88. Defendants Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud recommended and/or approved the D4E Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

    a.    The LCS raised significant questions concerning D4E's ability to repay the debt. The loan file and the LCS each lacked any analysis of D4E's cash flow. However, the LCS identified D4E's "debt to reported income" as a "key risk" of the transaction. Because D4E's only asset was a non-income-producing tract of land in Brunswick, Georgia, it was apparent that the D4E had little, if any, ability to repay the debt.

    b.    D4E's inability to repay the debt placed increased reliance on the guarantors. Yet, contrary to the admonitions of the Bank's regulators and loan consultant, neither the loan file nor the LCS

contained any detailed cash flow analysis for either guarantor. A proper evaluation would have revealed that JD, the primary guarantor, had limited liquidity of only $100,000 and had a net worth that was based almost entirely on fluctuating real estate values in a declining market. Further, JD's total exposure spanned six notes with the Bank, for a total indebtedness of $4,169,208. Accordingly, it was highly unlikely the borrower and guarantors could repay the debt.

c. Given the limited liquidity of the borrower and guarantors, the Bank was forced to rely almost exclusively on the value of the collateral, which was a first lien in which the only improvements consisted of a completely gutted and uninhabitable shell structure formerly used as a 128-room motel that was empty on the date of origination. The Bank also had a third lien on three duplex lots in Saint Simons Island, which provided no value due to the inferior loan position.

89. The D4E Transaction defaulted, and the Bank suffered a loss of $797,000.

90. Defendants Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud acted negligently, grossly negligently, and

in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the D4E Transaction, causing the Bank damages.

## DKK Transaction

91.    On or about December 18, 2008, Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, Perry, Segerberg, and Stroud approved a disbursement of $150,000 to DKK (the "DKK Transaction"). The DKK Transaction related to a prior transaction with the Bank for the purpose of establishing a business line of credit for the development of an additional phase of a residential subdivision. The DKK Transaction was secured by a first lien on four lots in the subdivision, as well as the guaranties of Defendant DeLoach and two of his business partners.   The terms of the DKK Transaction called for monthly payments of interest only, with principal due at maturity.

92.    Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, Perry, Segerberg, and Stroud recommended and/or approved the DKK Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

> a.    The loan file and the LCS lacked any cash flow analysis, leaving the Bank to rely almost exclusively on either the sale of the collateral or the financial wherewithal of the guarantors.
>
> b.    With regard to their dependence on the sale of the collateral,

- 39 -

Defendants were aware of but ignored the fact that the real estate market was in steep decline. As stated in a December 2008 memorandum from the presenting loan officer, "lot sales on St. Simons have been very slow for the last two years." Despite this, Defendants gave DKK $180,000 to *add to* a subdivision in which lots were not selling. Further, Defendants approved the transaction without requiring that DKK make any curtailments, sell lots at a discount, or sell the collateral in bulk.

c.     The DKK Transaction was guaranteed by Defendant DeLoach and two of his business partners. Although the LCS provided that Defendant DeLoach's financial information is on file, the second guarantor's liquid assets were only $108,000, and there is no information on the third guarantor. These facts and omissions were clear red flags to the Defendants that the debt was unlikely to be repaid.

93.     The DKK Transaction defaulted, and the Bank suffered a loss of $165,000.

94.     Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, Perry, Segerberg, and Stroud acted negligently, grossly

negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the DKK Transaction, causing the Bank damages.

## JH Transaction

95.     On or about December 6, 2007, Defendants Strange, Welch, Champion, DeLoach, Perry, and Stroud approved a $1.25 million transaction with JH, a spec home builder, and his wife, a homemaker (the "JH Transaction"). The purpose of the JH Transaction was to pay off existing debts and to provide JH with $455,063 in cash to turn portions of raw land into a hunting preserve. The terms of the JH Transaction called for twelve monthly payments of interest only with the principal due at maturity. The JH Transaction was secured by a first lien on the raw land.

96.     Defendants Strange, Welch, Champion, DeLoach, Perry, and Stroud recommended and/or approved the JH Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

> a.     Neither the loan file nor the LCS contained any cash flow analysis of JH. In fact, the information available to the Defendants clearly indicated that the borrowers were unlikely to be able to repay their debt, in violation of the Loan Policy. That information included, but was not limited to:

   i.  The LCS indicates that JH had approximately $1 million in direct and/or indirect debt, with liquid assets of only $140,000.

   ii.  The LCS did not have any financial information about JH's wife, despite the fact that she was a co-borrower.

   iii.  At the time of origination, JH had eight other notes with the Bank, and this transaction brought JH's total debt service up to $70,000/year. This was especially problematic considering the LCS' disclosure of JH's AGI as $73,371, leaving JH's DTI ratio at approximately 100%.

 b. The LCS provided that the amount of the JH Transaction exceeded the Bank's lending limit, as set forth in the Loan Policy.

 c. The Defendants failed to recognize the fact that a large portion of the raw land collateral had limited value due to it being classified as wetlands and subject to substantial federal regulation. Further, the upland portion of the collateral did not contain any ingress or egress.

97.    The JH Transaction defaulted, and the Bank suffered a loss of $1,088,000.

98.    Defendants Strange, Welch, Champion, DeLoach, Perry, and Stroud acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the JH Transaction, causing the Bank damages.

## JSH Transaction

99.    On or about April 17, 2008, Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, and Stroud approved a $1.602 million transaction to JSH, a husband and wife who operated a nutritional service center in Brunswick (the "JSH Transaction").    The JSH Transaction was secured by seven condominium units in Brunswick, the purchase of which was financed by the transaction.

100.    Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, and Stroud recommended and/or approved the transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

      a.    Neither the LCS nor the loan file contained any cash flow analysis of the borrowers.    The LCS raised several red flags regarding their ability to repay the debt.   For example, at the

time of origination, JSH had approximately $1 million in direct and/or indirect debt, with liquid assets of only $10,000. Further, the LCS was missing several pieces of key information regarding the husband, a co-borrower.   To the extent any information was provided, it was either a red flag (as indicated by the LCS' listing of "co-borrower credit" as a "key risk") or based on stale information (the LCS indicates the Defendants relied on 2005 information to make the loan).

b.     The LCS also provided that the amount of the JSH Transaction exceeded the Bank's lending limit.

c.     There were also significant cash flow issues that were never addressed in the LCS.   Even a cursory examination of the borrowers' financial situation would have revealed they were significantly overleveraged. They had five other notes with the Bank, as well as two other proposed loans, bringing total debt service for the entire relationship up to $236,000/year.   This brought their DTI ratio up to approximately 200% of the borrowers' combined 2008 AGI, making it unlikely that the borrower could repay the debt.

101.   The JSH Transaction defaulted, and the Bank suffered a loss of $753,000.

102.   Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, and Stroud acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the JSH Transaction, causing the Bank damages.

### PT Transactions

103.   In 2008, the Bank entered into two separate transactions with PT.  The first was on or about February 13, 2008, Defendants Cross-McKinley, Strange, O'Connor, Champion, DeLoach, and Perry approved a transaction with PT in the amount of $316,000 (the "First PT Transaction").   The purpose of the First PT Transaction was to pay off an existing HELOC and providing PT with $182,597 in cash.  Terms of the First PT Transaction called for interest-only payments, with a ten year balloon.   The PT Transaction was secured by a second lien on real property on Saint Simons Island and an assignment of PT's Sea Island membership.

104.  Defendants   Cross-McKinley,   Strange,   O'Connor,   Champion, DeLoach, and Perry recommended and/or approved the First PT Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

a.  Neither the file nor the LCS contained any cash flow analysis indicating PT would have the capacity to repay the debt. The little amount of financial information contained in the LCS was either stale or weighed against approving the transaction.  At the time of origination, PT already had approximately $1.3 million in direct and/or indirect debt, and had liquid assets of only $34,000.  Further, the AGI on the LCS was based on 2006 numbers.  Had the Defendants complied with the Loan Policy and used current financial information, they would have been informed that PT's AGI dropped by more than $87,000 from 2006 to 2007.

b.  Given PT's lack of liquidity and cash flow, repayment of the loan was dependent on the Bank's second lien position on the collateral.   Further, PT's assignment of her Sea Island membership was essentially worthless, as no appraisal or other attempt to value the collateral was ever done.

105.  The First PT Transaction defaulted, and the Bank suffered a loss of $316,000.

106.  Defendants   Cross-McKinley,   Strange,   O'Connor,   Champion, DeLoach, and Perry acted negligently, grossly negligently, and in breach of their

fiduciary duties to Oglethorpe in making and/or recommending and/or approving the First PT Transaction, causing the Bank damages.

107.   On or about August 21, 2008, Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud approved another transaction with PT, this time in the amount of $422,000 (the "Second PT Transaction").  The purpose of the Second PT Transaction was to purchase and remodel an investment condo, and the terms called for interest-only payments for twelve months, with principal due at maturity.  The collateral for the Second PT Transaction was a first lien on the condo unit.

108.   Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud recommended and/or approved the transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

> a.     Like the First PT Transaction, the loan file and the LCS each devoid of any cash flow analysis or information regarding PT's likelihood of repayment.  In fact, the information presented or available to the Defendants indicated that it was unlikely PT could service and/or repay the debt.  At the time of origination, PT had approximately $2.2 million in direct and/or indirect debt.  Yet her AGI for 2007 was only $82,982, which had

decreased by more than $87,000 from 2006.  Defendants knew or should have known that PT would be an unrealistic source of repayment.

b.    Given PT's lack of liquidity and modest income, repayment of the loan was largely dependent on the value of the collateral. At the time the loan was approved, Defendants were aware the real estate market on Saint Simons Island was in a severe decline, rendering any collateral valuation uncertain and speculative.

c.    The 70% LTV was based on an "as completed" appraisal of $600,000.  However, the Loan Policy requires funding at 85% of the lower of value or cost.  The cost was $333,333 plus estimated $70,000 to renovate.  Therefore, the LTC ratio was 100%, in violation of the Loan Policy.

109.   The Second PT Transaction defaulted, and the Bank suffered a loss of $14,000.

110.   Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the Second PT Transaction, causing the Bank damages.

## TH Transaction

111.   On or about April 25, 2008, Defendant Cross-McKinley approved a $25,000 transaction with TH (the "TH Transaction").   The purpose of the TH Transaction was to fund undisclosed "short term expenses."   The terms called for payment at the end of 180 days, and the transaction was secured by a 1994 8x28 trailer.

112.  Defendant Cross-McKinley recommended and/or approved the transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

    a.    Neither the LCS nor the file lacked any cash flow analysis, tax returns, or other financial statements that may have demonstrated TH's ability to repay the debt.  Further, the LCS was missing information under every financial category except for TH's credit beacon score.

    b.    TH's low credit score of 586 was flagged as a key risk to the transaction.  Had she properly investigated the loan, Defendant Cross-McKinley would have been informed that TH's credit report describes a large charge off of $64,638 at another bank.

    c.    Given the unlikelihood of TH repaying the debt, Defendant Cross-McKinley apparently relied solely on the collateral as a

source of repayment.  According to the LCS, the collateral was valued at $25,000.  However, it is unlikely that the trailer would have sold for that amount, making it very unlikely that the Bank would have been able to fully recover the debt.

113.    The TH Transaction defaulted, and the Bank suffered a loss of $25,000.

114.    Defendant Cross-McKinley acted negligently, grossly negligently, and in breach of her fiduciary duties to Oglethorpe in making and/or recommending and/or approving the TH Transaction, causing the Bank damages.

**SEF Transactions**

115.    On or about June 19, 2008, Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Champion, DeLoach, Perry, Segerberg, and Stroud approved a $935,000 transaction with SEF (the "First SEF Transaction"), a company that was involved in speculative commercial real estate and owned by SF, who in turn owned a flooring company.  The purpose of the First SEF Transaction was to purchase a commercial building in Brunswick, Georgia.  The terms of the transaction called for interest-only payments for twelve months with principal due at maturity.  The transaction was secured by a first lien on the purchased commercial property and a guaranty from SF.

116. Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Champion, DeLoach, Perry, Segerberg, and Stroud recommended and/or approved the First SEF Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

a. The file and the LCS lack any cash flow analysis or other report documenting SEF's ability to repay the debt. At the time of origination, the LCS noted that SEF's total direct and/or indirect indebtedness was $2.1 million. Further, tax returns from 2003 to 2006 reported consistent losses for SEF.

b. A memo dated July 1, 2008 indicates that the Defendants were relying on SF's flooring business as a source of repayment, despite the fact that SF had no prior history or experience in the flooring industry. The secondary source of repayment was the financial resources of SF, the guarantor. However, the Bank's relationship with SF and her husband was over-concentrated, as the Bank had loaned more than $6 million to them by March of 2009.

c. The LCS further provided that the guarantor's liquid assets were only $30,000, and that her credit beacon was subprime. The guarantor's credit is listed as a Loan Policy exception on

the LCS.   The guarantor also had weak liquidity ranging between $8,000 and $79,400 from 2003 to 2008, with her net worth concentrated in real estate and closely-held entities ranging from 85% in 2003 to 96% in 2008.

    d.    The LCS stated that the amount of the First SEF transaction exceeded the lending limit set forth in the Loan Policy.

117.   The First SEF Transaction defaulted, and the Bank suffered a loss of $158,000.

118.   Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Champion, DeLoach, Perry, Segerberg, and Stroud acted negligently, grossly negligently, and in breach of her fiduciary duties to Oglethorpe in making and/or recommending and/or approving the First SEF Transaction, causing the Bank damages.

119.   On or about March 6, 2009, Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud approved another $527,344 to SEF (the "Second SEF Transaction").   In exchange for these funds, the Bank took a second lien on the commercial property collateral in the First SEF Transaction, as well as a security interest in, among other things, accounts receivable, inventory, and furniture, fixtures and equipment.

120.  Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud recommended and/or approved the transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

a.   The Bank had not updated its file or its LCS with any cash flow statements or other information regarding SEF's ability to repay the debt.  The LCS did not provide any information regarding SEF's AGI.

b.   At the time of the Second SEF Transaction, SEF had accumulated approximately $3.6 million in direct and/or indirect debt.

c.   Although the Bank took new collateral in exchange for the Second SEF Transaction, the file is devoid of any information regarding valuation of the collateral.

d.   When properly combining the first and second lien balances on the commercial property collateral, the LTV was 133%, in violation of the Loan Policy.

e.   The Bank took a second lien on the commercial real estate collateral despite the Defendants' knowledge that the real estate market was in steep decline.  In fact, a memorandum dated

October 28, 2008 indicated that the SEF Transactions (as well as other transactions with or involving SF) were being downgraded due to the deteriorating real estate market.

f.   As noted in the LCS, the Second SEF Transaction exceeded the lending limit set forth in the Loan Policy.  In fact, the Bank's relationship with SF was flagged as a concern by regulators in 2009.

121.   The Second SEF Transaction defaulted, and the Bank suffered a loss of $527,000.

122.   Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud acted negligently, grossly negligently, and in breach of her fiduciary duties to Oglethorpe in making and/or recommending and/or approving the Second SEF Transaction, causing the Bank damages.

## **MR Transactions**

123.   Over a nearly three-year period, Defendants approved four separate transactions involving MR.  MR was a real estate agent for the company owned by Defendant DeLoach and the brother of Defendant Bailey.

124.  On or about September 5, 2007, Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud approved a

$120,000 line of credit (the "First MR Transaction"). The purpose of the First MR Transaction was to provide MR with funds to complete construction on her primary residence. The terms called for twelve months of interest-only payments, with principal due at maturity. The First MR Transaction was secured by an "assignment of future commissions" purportedly valued at $300,000.

125.    Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud recommended and/or approved the First MR Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

a.    The file and the LCS were devoid of any cash flow analysis or report regarding MR's ability to repay the debt. Further, the limited financial information that was contained in the LCS was either stale or cause for concern. For example, the LCS indicated that the Defendants relied on financial information from 2005, and that the Bank had requested (but apparently had not yet received) information for 2006. Further, the LCS provided that, at the time of origination, MR had approximately $900,000 in direct debt. Finally, the fact that MR was willing to pledge her future commissions in a declining real estate market as collateral was a clear sign of MR's cash flow stress.

     b.     A memorandum dated September 7, 2007 noted that MR's prior construction loan, which was also with the Bank, was fully disbursed and was already at a 90% LTV. Defendants' approval of the First MR Transaction was, in effect, an "end run" maneuver to maintain MR's construction loan at a 90% LTV while still providing loan proceeds to complete construction of her house.

     c.     MR's future sales commissions in a declining real estate market, pledged as collateral to secure the First MR Transaction, were essentially worthless, and the transaction was for all practical purposes unsecured.

126.   The First MR Transaction defaulted, and the Bank suffered a loss of $117,000.

127.   Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud acted negligently, grossly negligently, and in breach of her fiduciary duties to Oglethorpe in making and/or recommending and/or approving the First MR Transaction, causing the Bank damages.

128.   On or about August 24, 2008, Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud approved a $710,000 transaction with MR (the "Second MR Transaction"). The purpose of the Second

MR Transaction was to fund MR's purchase of three residential lots in exchange for her primary residence. The terms of the Second MR Transaction called for twelve interest-only payments, and the establishment of a $50,000 interest reserve. The Second MR Transaction was secured by the three residential lots involved in the transaction.

129. Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud recommended and/or approved the Second MR Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

a. The file and LCS lacked any cash flow analysis or reports regarding MR's ability to repay her debts. By this point, the First MR Transaction had matured and remained unpaid. Further, at the time of origination, MR had $152,576.17 in direct debt. MR's loan file documented her poor credit history, including multiple slow pays, a charge off, and seven accounts subject to collection. Although the LCS did not contain any annual income information, it indicated that MR's financial situation was deteriorating. Finally, MR's liquid assets had dropped by $48,000 from 2007, and her net worth had declined dramatically by approximately $1.1 million from 2007. Each

of these facts, taken together, made it apparent that MR was overleveraged and unable to repay her debt.

b.  Additionally, an August 25, 2008 memorandum raised concerns regarding MR's ability to service the debt. The memo stated that the Bank was relying solely on MR's uncorroborated assertion that she anticipated earning more than $200,000 in real estate commissions in 2008, and would therefore likely make the same amount in 2009. By this time, however, Defendants were well aware that real estate markets were in steep decline, and the LCS identified the "slow real estate market" as a "key risk" of the loan. The memo further indicated that the Bank "suspect[s] [Defendant DeLoach's company] would again come to the rescue if need be along with [MR's] dad who is a prominent Athens, Georgia attorney."

c.  The Second MR Transaction constituted 100% financing of residential lots. Therefore, both the LTC and LTV ratios were at 100%, in violation of the Loan Policy.

d.  Despite the conflict created by the fact MR was his employee, Defendant DeLoach voted to approve this loan.

130.   The Second MR Transaction defaulted, and the Bank suffered a loss of $236,000.

131.   Defendants Cross-McKinley, Strange, O'Connor, Welch, Champion, DeLoach, Perry, and Stroud acted negligently, grossly negligently, and in breach of their fiduciary duties to Oglethorpe in making and/or recommending and/or approving the Second MR Transaction, causing the Bank damages.

132.   The third transaction with MR was approved by Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud on or about September 19, 2008, in the amount of $153,000 (the "Third MR Transaction").   The purpose of the transaction was vaguely listed as "debt consolidation," and the terms again called for twelve interest-only monthly payments with principal due at maturity.   The Third MR Transaction was unsecured, but was backed by a guaranty from the real estate company owned by Defendant DeLoach and his business partner (who was the brother of Defendant Bailey).

133.  Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud recommended and/or approved the Third MR Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

a.  Neither the file nor the LCS contained any cash flow analysis or other information demonstrating MR's ability to repay the debt. The LCS indicated that MR had accumulated $872,576.17 in direct debt, but it lacked any annual income information. Further, MR was still suffering from the same cash flow issues described above, with her liquid assets and net worth having deteriorated significantly from 2007 to the date of origination. The information available to the Defendants indicated that MR was unable to repay her debts.

b.  A memorandum dated August 25, 2008 explained that the Third MR Transaction was a result of a shortfall of $53,000 in connection with the trade of her residence in the Second MR Transaction, and $100,000 "to get [MR] through the next 12 months." The memorandum also stated that "[MR], like a lot of other real estate folks, is having a very difficult time making a living." This recognition was memorialized in the LCS, which listed the "slow real estate market" as a key risk of approving the transaction.

c.  The Third MR Transaction was approved roughly one year after the First MR Transaction, which was supposed to have been

paid back with MR's commissions.   The fact that MR was requesting an additional loan to meet her expenses, when viewed in connection with her financial situation as outlined in the August 25, 2008 memorandum referenced above, was yet another red flag indicating that she was unable to repay the debt.

134.   The Third MR Transaction defaulted, and the Bank suffered a loss of $153,000.

135.   Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud acted negligently, grossly negligently, and in breach of her fiduciary duties to Oglethorpe in making and/or recommending and/or approving the Third MR Transaction, causing the Bank damages.

136.   Finally, on or about October 1, 2009, Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud approved another transaction with MR in the amount of $590,000 (the "Fourth MR Transaction").   The purpose of the transaction was to construct MR's new primary residence, and the terms once again called for twelve monthly interest-only payments with principal due at maturity.   The Fourth MR Transaction was secured by a first lien on the residence.

137. Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud recommended and/or approved the Fourth MR Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

    a.    The file and the LCS lacked any analysis of MR's cash flow or repayment ability.  However, MR's cash flow deficiencies, which by this time were well known to the Defendants, were glaring.  The LCS indicated that MR's direct debt at the time of origination was $661,407.00, her liquid assets had dropped to $25,000, and her net worth had dipped to negative $54,587.  Further, the Defendants were aware that this residence was being built on one of the three lots purchased with the proceeds of the Second MR Transaction, another sign that MR was accumulating debt she could not repay.

    b.    Given MR's readily apparent cash flow issues, Defendants relied exclusively on the collateral as the repayment source.  However, the appraisal that purportedly supported the Fourth MR Transaction expressly noted that housing trends in Saint Simons were declining due to an oversupply of inventory. The

Defendants either willfully disregarded this critical information or failed to inform themselves of it in connection with approving this transaction.

138.  The Fourth MR Transaction defaulted, and the Bank suffered a loss of $299,000.

139.  Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud acted negligently, grossly negligently, and in breach of her fiduciary duties to Oglethorpe in making and/or recommending and/or approving the Fourth MR Transaction, causing the Bank damages.

**HoldCo Transaction**

140.  On or about May 21, 2009, Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud approved a $2.5 million loan to the holding company ("HoldCo") of another Georgia bank (the "HoldCo Transaction").  The purpose of the HoldCo Transaction was to provide a capital injection to HoldCo.  As collateral for the transaction, HoldCo pledged 399 shares of its subsidiary's stock.  The terms called for quarterly interest payments at an 8% rate, with a twelve month maturity.

141.  Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud recommended and/or

approved the HoldCo Transaction despite at least the following manifest violations of prudent lending principles and material requirements of the Loan Policy:

    a.    The file was devoid of any cash flow analysis or other indication regarding the creditworthiness of HoldCo.  In fact, no LCS was prepared.  Rather, the only memorialized discussion regarding the HoldCo Transaction can be found in Board Minutes dated May 21, 2009.  The HoldCo Transaction was approved without any budget, cash flow projections, or discussion regarding HoldCo's debt service abilities.

    b.    The HoldCo Transaction was approved without any appraisal or other analysis of the value of the collateral. In fact, documents within the file indicate that it was worth $33/share, for a total value of only $13,167.

    c.    Defendants were aware that HoldCo's subsidiary was in a precarious financial situation.

    d.    The HoldCo Transaction occurred at a time when the financial crisis had just begun, Oglethorpe had just applied for TARP funds, and several banks in Georgia had already failed.

    e.    The HoldCo Transaction constituted an "undesirable loan" as defined under the Loan Policy.

142.   The HoldCo Transaction defaulted, and the Bank suffered a loss of $2,250,000.

143.   Defendants Cross-McKinley, Strange, O'Connor, Welch, Bailey, Carmical, Champion, DeLoach, Perry, Segerberg, and Stroud acted negligently, grossly negligently, and in breach of her fiduciary duties to Oglethorpe in making and/or recommending and/or approving the HoldCo Transaction, causing the Bank damages.

### F.   Prejudgment Interest

144.   Under section 11(1) of the FDI Act, 12 U.S.C. § 1821(1), the FDIC as Receiver may recover prejudgment interest.   Under O.C.G.A. § 51-12-14, prejudgment interest accrues 30 days after the receipt of a demand letter that complies with the statutory requirements until the date of judgment, if the judgment amount equals or exceeds the demand. Counsel for FDIC sent demand letters to the Defendants on August 1, 2011.

145.   The FDIC is entitled to prejudgment interest at the Georgia statutory rate of prime plus 3 percent from August 1, 2011 through date of judgment.

146.   The losses outlined above are based on information currently available to the FDIC-Receiver, and the amounts are subject to change as additional information is discovered.

# V.
# CAUSES OF ACTION

## COUNT I
## NEGLIGENCE (AGAINST ALL DEFENDANTS)

147.   The FDIC-Receiver incorporates by reference each of the allegations in the above paragraphs 1 to 146 as if fully restated herein.

148.   Defendants, as officers and/or directors of Oglethorpe, each owed a duty of care under common law, and O.C.G.A. §§ 7-1-490 and 51-1-2, among other laws and regulations, to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in the management, supervision, and conduct of the Bank's business and financial affairs, including its practices with respect to the lending of depositor funds.

149.   Further, each Defendant agreed and was obligated by statute, contract, and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws, rules, and regulations, as well as all applicable policies, rules, and regulations. Each Defendant signed the Oath, affirming that they had: (i) "a legal responsibility and a fiduciary duty to shareholders to administer the [Bank's] affairs faithfully and to oversee its management"; (ii) a duty to "exercise reasonable care and place the interests of the [Bank] before [their] own interests"; and (iii) an obligation to "fulfill [their] duties of loyalty and care" to the Bank.  Therefore, Defendants,

collectively and individually, owed a duty of due care and diligence and/or fiduciary duty in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound, and prudent.

150.   By their actions and inactions, as alleged herein, each of the Defendants failed and neglected to perform his or her respective duties as Officers and/or Directors of the Bank, constituting breaches of his or her statutory and common law duties of care owed to the Bank.  These duties included, but were not limited to:  (i) ensuring that there were adequate policies, procedures, and internal controls relating to, among other things, commercial and CRE lending;  (ii) properly supervising the Defendants to ensure they did not make negligent or grossly negligent loans and extensions of credit as part of a plan to unreasonably grow the Bank;  (iii) adhering to the Loan Policy and prudent and sound lending practices when approving loans;  (iv) ensuring that the Bank followed all banking statutes and regulations; and (v) the duty of due care and diligence and/or fiduciary duty in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound, and prudent.

151.   Defendants are not entitled to the application of the business judgment rule for several reasons, including, but not limited to their failure to: (i) engage in a

reasonable good faith process to evaluate the subject loans before approval; (ii) become reasonably well-informed by heeding regulators' warnings regarding over-concentration in commercial and CRE lending and loan underwriting and risk management deficiencies; (iii) adhere to the Loan Policy and document any exceptions or explain why any exception was necessary; (iv) recognize the clearly unacceptable and imprudent risk that the depositor funds would not be repaid; (v) exercise business judgment with regard to the specific loans described above; and (vi) engage in reasonable review, investigation, and/or deliberation before approving the loans.

152.   By their actions and inactions, as described specifically and generally herein, Defendants, as directors and/or officers of the Bank, collectively failed and neglected to perform their fiduciary duties with due care and diligence and took actions and made decisions without being reasonably informed and with conscious disregard for the risks, constituting breaches of their statutory and common law duties of care, as follows: (i) pursuing an aggressive commercial and CRE lending stratagem that placed short-term income and profits ahead of compliance with the Bank's policies, banking statutes and regulations, and prudent and sound lending practices; (ii) failing to ensure that the commercial and CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices; (iii) failing to monitor and supervise the officers and

employees of the Bank with respect to commercial and CRE lending; (iv) disregarding and failing to take appropriate steps to address obvious problems, i.e., "red flags," with respect to the commercial and CRE lending; (v) failing to inform themselves about the risks that the credit transactions posed before they approved them; (vi) failing to exercise independent judgment in connection with the review and approval or disapproval of credit transactions; (vii) failing to ensure that commercial and CRE loans approved by the Board or DLC were safe, sound, and reasonable, and that the borrowers were creditworthy; (viii) failing to confirm that the extensions of credit were underwritten in a safe and sound manner; (ix) failing to ensure that the credit transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of loss; (x) approving credit transactions that caused the Bank to exceed relevant concentration limits; (xi) failing to implement and require bank officers to follow sound loan underwriting and credit administration practices; (xii) failing to implement and monitor prudent risk management strategies; (xiii) allowing officers repeatedly to violate the Loan Policy, and approving loans that were in material violation of the Loan Policy; (xiv) spending depositor and shareholder funds in pursuit of their own self-interest over that of the Bank; and (xv) failing to properly supervise and oversee the loan operations.

153.   In connection with their actions and inactions described in this Complaint, Defendants failed to make decisions on the basis of a rational process; failed to avail themselves of all material and reasonably available information; abdicated their functions and, without making a conscious decision to abstain from action, failed to act; and disregarded repeated warnings from regulators and third parties.

154.   Defendants also knew, or in the exercise of reasonable diligence, should have known that their practices and the practices of other Bank officers and employees over whom they exercised supervisory control were improper, imprudent, and harmful to the Bank.

155.   With respect to the Loss Transactions they approved, each of the Defendants owed to the Bank duties that included, but were not limited to, informing himself or herself about the proposed loans and the risks the loans posed to the Bank before voting on the loan; approving loans that conformed with the Loan Policy; ensuring that any loans he or she approved were underwritten in a safe and sound manner; ensuring that any loans approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that any loans approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

156.   With respect to the Loss Transactions that each approved, Defendants were in breach of their duties in that, among other things, they failed to adhere to lending policies, applicable requirements, and sound lending practices, and were aware, or in the exercise of reasonable diligence should have been aware, of the deficiencies in underwriting and loan support exhibited by the Loss Transactions identified above, yet Defendants approved the transactions anyway.

157.   Defendants also disregarded the duties they acknowledged when signing the Oath, which include, but are not limited to: (i) the "legal responsibility and a fiduciary duty to shareholders to administer the [Bank's] affairs faithfully and to oversee its management"; (ii) their promise to "exercise reasonable care and place the interests of the [Bank] before [their] own interests"; (iii) their promise to "fulfill [their] duties of loyalty and care to the [Bank]"; and (iv) their promise to "diligently and honestly administer the affairs of the [B]ank[.]"

158.   Defendants negligently performed their obligations under the Oath by way of their actions and inactions as alleged in this Complaint, and some Defendants have acknowledged their failures in at least the following ways:

- Defendant Bailey stated that she "many times felt that loans were skimmed over and [the Board was] given fast [and] surface information.  I had a little of a blind trust (they were the experts [and] been doing this a long time [and] had been successful).  Perhaps if [the Board] had been given more in-depth info, different decisions might have been reached[.]  It was always (loans) presented that they couldn't possibly fail."

- Defendant Bailey also stated that the Board "loaned money where not

- 71 -

enough collateral was put up or not enough research was done to make sure the party had enough cash flow to pay the loan."

- Defendant Bailey further provided that there was "too much money spent on unnecessary perks and benefits for the officers, employees and board members (i.e. country club memberships, cars and gas for 2 of the 3 officers[,]" and also named "director's fees [and] weekend board retreats" as other items the Board "spent too much money on."

- Defendant Perry said that there was "very little" group discussion with regard to the approval process. Instead, the "Executive Committee made most of the decisions and their meetings were not reported to the whole board," which simply "carr[ied] out the orders of the Executive Committee with little input from others."

- Defendant Stroud echoed this concern, stating that "[m]ost decisions are made by Executive Committee and/or management" and discussions were "usually held to meet consensus prior to [the] vote."

- Defendant Perry also stated his belief that he never felt he "was ever involved in any [loan review] tasks," or that "the board was part of the loop."

- Defendant Stroud acknowledged that he only "sometimes" got the right amount of information to make an informed decision.

159.   Defendants' breaches of duty were committed also with respect to Loss Transactions that each voted to renew and/or extend, or that constituted renewals and extensions, in whole or in part, rendering Defendants liable for all losses incurred by the Bank on such loans.

160.   As a direct and proximate result of the negligent acts and omissions of the Defendants, the Bank and the FDIC-Receiver suffered damage and sustained losses in such amount as will be proved at trial.

161.   With respect to their actions and inactions in managing the affairs of the Bank, Defendants pursued a common plan or design and, therefore, each Defendant is jointly and severally liable for all losses.  The Defendants are liable to the FDIC-Receiver, jointly and severally, in such amount as will be proved at trial.

162.   At a minimum, each Defendant who approved a Loss Transaction is liable in the amount of the loss associated with that Transaction.

## COUNT II
## GROSS NEGLIGENCE (AGAINST ALL DEFENDANTS)

163.   The FDIC incorporates by reference each of the allegations in the above paragraphs 1 to 162 as if fully restated herein.

164.   Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law.  Section 1821(k) also provides a claim for gross negligence is prosecuted wholly or partially for the benefit of the FDIC.  Georgia law defines "gross negligence" as the absence of that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

165.   Defendants, at all times, owed Oglethorpe a duty to use care, skill, and diligence in the performance of their duties as officers and/or directors of Oglethorpe.

166.   Defendants' actions and inactions as described herein exhibit such a degree of carelessness and/or inattention as to constitute gross negligence under Georgia law.

167.   With respect to their grossly negligent actions and inactions, Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all damages.

168.   As a direct and proximate result of these Defendants' gross negligence, the Bank and the FDIC-Receiver suffered damages in an amount to be proven at trial.

169.   At a minimum, each Defendant who approved a Loss Transaction is liable in the amount of the loss associated with that Transaction.

### COUNT III
### BREACH OF FIDUCIARY DUTY (AGAINST ALL DEFENDANTS)

170.   FDIC incorporates by reference each of the allegations in the above paragraphs 1 to 169 as if fully set forth herein.

171.   Each of the Defendants, as officers and/or directors of the Bank, served in a fiduciary capacity and owed fiduciary duties to, *inter alia*, depositors to

exercise their duty of care, as well as complete loyalty, honesty, and good faith in the management, supervision, and conduct of the Bank's business and financial affairs, including but not limited to the lending and safe-keeping of depositor funds.

172.   By their actions and inactions, as specifically described herein, each of the Defendants abused their discretion and/or acted in bad faith in the performance of their respective duties as officers and/or directors of the Bank, constituting breaches of their fiduciary duties.  These breaches include, but are not limited to, wasting corporate assets and ignoring banking laws, regulations, supervisory guidance, and the Bank's own written loan policies and procedures in order to fund the endeavors of their friends, acquaintances, and business partners.

173.   With respect to their breach of fiduciary duties, Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all damages.

174.   As a direct and proximate result of these Defendants' breach of fiduciary duties, the Bank and the FDIC-Receiver suffered damages in an amount to be proven at trial.

175.   At a minimum, each Defendant who approved a Loss Transaction is liable in the amount of the loss associated with that Transaction.

## COUNT IV
## REQUEST FOR RELIEF

176.   Pursuant to Federal Rule of Civil Procedure 38, the FDIC-Receiver demands a trial by jury on all claims.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation, as Receiver for Oglethorpe Bank, requests entry of judgment in its favor against Defendants as follows[6]:

1.      For compensatory damages and other damages, jointly and severally, in an amount to be proved at trial;

2.      For its costs of suit against all Defendants;

3.      For prejudgment and other appropriate interest pursuant to 12 U.S.C. § 1821(l);

4.      Such other and further relief as the Court deems just and proper; and

5.      Plaintiff demands a trial by jury on all issues.

---

[6] Solely with respect to Defendant Strange, who filed for bankruptcy and is named in this action as a nominal defendant only, the FDIC-Receiver seeks a money judgment to perfect and effectuate recovery under the applicable insurance policies, as permitted by 11 U.S.C. § 524(e).  The FDIC-Receiver does not seek hold Strange personally liable for the payment of any judgment which may be rendered against him in this action, in accordance with 11 U.S.C. § 524(a).

**MILLER & MARTIN PLLC**

s/Michael P. Kohler
GA Bar No. 427727
mkohler@millermartin.com
Charles B. Lee (GA Bar No. 443095)
clee@millermartin.com
James T. Williams (GA Bar No. 185084)
jwilliams@millermartin.com
Michael J. Dumitru (to be admitted *pro hac vice*)
mdumitru@millermartin.com
832 Georgia Avenue, Suite 1000
Chattanooga, TN 37402
Telephone: (423) 756-6600
Fax: (423) 321-1611

Howard Klein
Counsel, Legal Division
Professional Liability Unit
Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, VA 22226
Telephone: (703) 516-5089
Fax: (703) 516-5067
hklein@fdic.gov

*Attorneys for Plaintiff Federal Deposit Insurance*
*Corporation, as Receiver for Oglethorpe Bank*